Paul Zeltner v. State of Ohio.

1. Events of Pursuit may be Proven by State to Establish a Crime.
   On trial for homicide the state may prove what took place in the pursuit and capture of the defendant.

2. Error in Excluding Evidence is Cured by Its Subsequent Admission.
   The subsequent admission of evidence before erroneously excluded cures the error of excluding such evidence.

3. Witness as to Reputation may be Asked as to Specific Instances of Trouble.
   A witness called by accused to testify as to the reputation of the accused as a quiet, peaceable citizen may be asked on cross-examination if he has not heard of instances of trouble he has had with his neighbors.

Zeltner v. State.

4. NOT COMPETENT TO PROVE AS DEFENSE THAT DECEASED ON A FORMER
OCCASION ·ATTEMPTED TO SHOOT ANOTHER.

   In a trial for homicide evidence that the decedent on a former
   occasion attempted to shoot another person is not competent,
   and it is not error to exclude such evidence.

5. OPINION OF WITNESS OFFERED TO PROVE A QUARREL MAY BE ASKED
AS TO EFFECT OF CONDUCT IN QUESTION.

   In trial for murder a witness offered by defendant to prove a
   quarrel with deceased it is not error in cross-examination to
   allow witness to be asked, "There was nothing occurred there
   in W's (deceased's) conduct, or language or manner, to arouse
   anybody, was there?"

6. THREE DEGREES OF UNLAWFUL HOMICIDE DEFINED.

   A charge is correct which defines the degrees of murder as fol-
   lows: "If the killing was unlawful only, with or without pur-
   pose or intent to kill, not malicious and without deliberate and
   premeditated malice, the degree of crime is manslaughter; 'if
   the killing was unlawful and malicious and with a purpose and
   intent to kill, but without deliberate and premeditated malice,
   the degree of crime is murder in the second degree; if all of
   these elements were present, if the killing was unlawful and
   malicious with deliberate and premeditated malice and with a
   purpose and intent to kill, then the degree of crime is murder
   in the first degree."

7. TIME NOT A REQUISITE IN DETERMINATION OF PREMEDITATION AS ELE-
MENT OF MURDER.

   In explaining the element of premeditation in murder, it is not
   error to   charge: "It is not the time of deliberation and pre-
   meditation that is requisite, but the actual existence and pre-
   meditation, before the time the fatal shot is fired."

[Syllabus approved by the court.]

ERROR to Wood common pleas court.

*F. A. Baldwin, E. T. Dunn* and *William Ramsey,* for plain-
tiff in error.

*E. G. McClelland,* Pros. Atty., and *J. O. Troup,* for defend-
ant in error.

KING, J.

On the twenty-fifth of March, 1899, óne Elias H. Westen-
haver came to his death in this county as alleged in an indict-
ment against the defendant, at the hands of the defendant, Paul
Zeltner, and one John Zeltner, whom, it is alleged, shot him to
death on that date with a revolver. After due proceedings were
had Paul Zeltner was brought to trial on that indictment and a
verdict of guilty of murder in the first degree rendered against

him with a recommendation on the part of the jury for mercy and he was sentenced to the penitentiary of the state for life in pursuance of a statute recently passed.

It is claimed there were errors committed on the trial of the case, in the admission and rejection of evidence, and in the charge of the court, and it is also claimed that the verdict is not sustained by the evidence. I will notice briefly these contentions.

On page 103 of the bill of exceptions one Clark was asked what Westenhaver had said or read in the presence of the jury about the contents of a letter. It was objected to by counsel for the state that the witness ought first to see the letter. The court sustained the objection. No argument or authority is cited to the court showing that this ruling was erroneous; besides the letter was afterwards offered in evidence and read to the jury.

On page 119 of the bill of exceptions the witness, Alfred B. Farmer, was first examined about his going to the defendant's house, or going to the vicinity of his house on Saturday evening, the date of the homicide. He was inquired what time he got there, and he said seven or eight o'clock. This question was asked. "Did you gain admittance to the house then?" Ans. "No." Q. "Why did you not gain admission to the house?" That was objected to; overruled and exception taken. Ans. "The reason was, that John and Paul Zeltner were in the house armed and refused to allow anyone to come over there." A motion was made to strike out the answer; overruled and exception. We do not think there was any error in the admission of that. We think that the state had a right to prove what took place in the pursuit and capture of the defendant. It is suggested that the answer contains more of an opinion than it does a fact, but all of the evidence of what took place around the house, while the defendants were inside, is more or less opinion, and there is nothing to the prejudice of the defendant insofar as his answer is an opinion. Insofar as it was a statement of fact it was entirely competent.

On page 131 of the bill of exceptions J. D. Burgoon was called by the defendant and testified in his behalf. He was at

Zeltner v. State.

the time holding the position of justice of the peace, and this homicide or quarrel started or occurred in his office when there was a trial before him and a jury; Mr. Westenhaver was a party to that case and acted as his own attorney. It appeared in evidence that he had made a statement of his case to the jury and the witness is asked how much Westenhaver claimed, and the answer was a hundred dollars.

"Q. That was for professional services in what case? Not answered.

"Q. Did Mr. Westenhaver make any statement of the case that was tried there before you? Ans. After the jury was sworn?

"Q. Yes, sir? Ans. Yes, he did.

"Q. I will ask you if in making that statement he said anything about what his claim was for? Ans. Yes, sir.

"Q. What did he say to the jury that his claim was for?" The state objected; sustained and exception. The defendant stated he expected to prove by witness in answer to question that Mr. Westenhaver stated at the time he made the statement to the jury of the case, that he claimed a hundred dollars due him from the defendants, John and Paul Zeltner, for services rendered by him in the case of Watson against John and Paul Zeltner, in the court of common pleas of Wood county, Ohio.

This was competent and ought to have been allowed to be answered, but the refusal of the court to allow it to be answered was not prejudicial to the defendant since it otherwise appears that Westenhaver did state that to the jury and that is what the suit was brought for, and the defendant in this case was one of the defendants in that, and he knew he was sued for a hundred dollars. If Westenhaver made any statement of the case at all, he certainly would have stated he claimed a hundred dollars.

On page 135 is another exception in the testimony of Mr. Hoot; he was present at the time of the trial and the time of the homicide or shooting which resulted in the death of Westenhaver. He was called to testify on this occasion to the reputa-

tion of Paul Zeltner as a quiet, peaceable citizen. He had stated he had the means of knowing it, and when inquired of as to what his reputation was he said: "It is good as far as I can hear and learn." He was then cross-examined thus: "You have heard of several instances of trouble he has had with his neighbors?" Objection; overruled and exception. Answer. "I have heard of his having one little trouble; that is all."

We think that was competent cross-examination.

On page 141 James Beard was called to testify to character. He testified to the opportunities he had to observe him and of his manner and intercourse with other people; he said he had as good an opportunity as anyone; that he made his acquaintance soon after he moved in the vicinity where defendant resided which was from the middle of March, 1897, until the month of February, 1899, on the farm adjoining, and the examination is as follows:

"Q. Was he a peaceable orderly law-abiding citizen? Ans. I call him a good peaceable law-abiding citizen.

"Q. Have you ever seen him tested in that regard? A. Well, not altogether. I have as far as knowing of things myself.

"Q. I mean his character as to being peaceable—a peaceable man; have you ever seen him tested in that regard?" The state objected; sustained and exception. Defendant stated he expected to prove by answer to question that he has many times seen and heard defendant jeered and taunted by people, which he did not resent, but acted peaceably in all respects.

"Q. Do you know what his reputation is in that community as being a peaceable and quiet man? By general reputation I mean the estimate by which he is held in that community in that respect. A. He was honored." On cross-examination he said he had heard of his having trouble but he did not know very much about it.

We think the defendant had ample opportunity to get all that this witness knew about the defendant as to his character for peaceableness or his being a law-abiding citizen and that the inquiry of him whether he had ever seen him tested in that regard, was to put to him a question containing a word that might

Zeltner v. State.

not have a very clear indication of what was meant. The defendant was permitted to inquire and ask all the questions he cared to ask as to the extent of the witness's acquaintance with the defendant and he is then asked the question upon the particular point involved in the transaction and he testified favorably to the defendant. · We don't think the defendant was prejudiced or that the question was competent.

On page 177 is a question asked of J. B. Dunn. He had been employed by John Zeltner, a brother of the defendant Paul, who was indicted with him, to have set aside a judgment that had been rendered against John by default or failure to appear in court and defend a case that had been brought against him by one Watson; in that case Westenhaver had at one time been his counsel. It appears before judgment was rendered he had been discharged, and after judgment was rendered this J. B. Dunn was employed. He was inquired of if he had any conversation with Westenhaver about it as follows:

"Q. Did Mr. Westenhaver act for him upon that matter? Ans. No, sir, and he did all he could to induce me not to act.

"Q. Did you have some conversation with Westenhaver about it? A. I did, just as I come out at the time of the trial.

"Q. You say you did have some conversation with him about that? A. I had.

"Q. What, if anything, did Mr. Westenhaver say to you about the condition of the pleadings in that case?" Objected to, sustained and exception; and counsel for defendant stated he expected to show by answer of the witness to this question that Mr. Westenhaver stated to him that the answer which he filed in the case of Watson against Zeltner did not set up or claim any affirmative relief on the part of the defendant in that case.

That certainly was not error.

On page 195 one Lawrence was called to testify. He lived in North Baltimore and he was inquired of if he knew Westenhaver in his lifetime, and he said he did,—saw him once in a hotel—and was asked if he knew of his habit of carrying a revolver, and he said he knew of his having a revolver one

night at the Anderson House. The question was asked: "Do you know of his general habit of carrying a revolver?" and he said, "I have always seen him have a revolver when I was out with him."

"Q. Do you know of his attempting to shoot anyone with a revolver." State objected; objection sustained and defendant excepted.

Counsel for defendant stated they expected to prove, in answer to question, that Westenhaver on one occasion, in his presence, attempted to shoot a person, and that he frustrated that attempt. Now that was clearly incompetent, and could not have any relation whatever to the transaction under investigation before the jury.

On page 200 Mr. Hoot is again a witness. In the lawsuit before the justice on the day of the shooting he represented the two Zeltners as their counsel. He told in the course of his testimony what took place as near as he could recollect between the Zeltners or either of them and Westenhaver immediately preceding the shooting.

On cross examination he was asked if he was attorney for the defendants and he said he was, and when they made a demand for the papers he told his clients it was all right that Westenhaver would return them and to let him take them. Then this question is asked: "Then during the time that John was demanding those papers you said to him 'John, don't let's have any trouble about these papers; Westenhaver will bring them back, and they are of no importance in the case,' did you not? Ans. I said that, yes, sir."

"Q. There was nothing occurred there in Westenhaver's conduct, or language or manner, to arouse anybody, was there? That is true, is it not?" That was objected to; overruled and exception. Ans. "I don't think there was at all."

It was urged that this was serious error, and it may be well doubted whether that answer is competent evidence. But first it must be noted that the witness was called by the defense for the purpose of showing, if it could be shown, that there had been a quarrel between the defendant on trial and the deceased

Westenhaver; that this quarrel gradually increased in heat and the defendant grew more and more excited; it being the claim of the defendant' that in the heat of that sudden quarrel he took the life of this man and that therefore there could be no purpose to commit murder much less any premeditation or deliberation—and he testified on that line as far as he was willing to go. It is true it was not very far—he does not tell about very much excitement—he does not make it very clear that the defendant was much excited, nor does he undertake to say that the defendant had any particular reason to be excited if his story is correct about it. Now what is meant by the word "arouse" I don't know. A person aroused would not be justified in committing murder. There must be something more than a mere arousing of one. A man may be aroused from his natural state, which may be one of lethargy, to a very high pitch of excitement and, in that excited condition, take human life and be legally guilty of murder rather than manslaughter. Now the word "arouse" as used in that question, was not in our judgment very prejudicial to the defendant though it might be incompetent. It does not express an opinion upon any question that the jury was called upon to decide in this case. Opinions of witnesses may be given as to a condition of excitement under which one is laboring. Had this witness been asked what was the condition of Zeltner, it would have been proper for him to have answered. *Stewart* v. *State,* 19 Ohio 302, 307. The only difficulty in this question is, he was not called upon directly to say what was his condition or otherwise, but to say what, if anything, had happened that ought to have excited him. Now in Rogers, Expert Test. 11, it is said that a witness may testify that a person acted strangely, and on the next page that he may testify whether a thing was done in a jocular manner.

He might have stated what Westenhaver said and did, whether it was insulting, as leading up to the time that Westenhaver did in some manner excite the angry passions of this defendant. It is stated in Gillet, Indirect & Collat. Ev. 267, that a witness may testify whether he observed in another the manifestations of joy, despondency, fright, intoxication, friendliness

Wood County.

or hostility.   If the opinion which it is sought to have the witness express is based on multifarious facts (the right to sum up those facts resting on the ground of necessity), the witness should first be required to state, so far as possible, the facts upon which he bases his opinion; and in a note beginning on page 267 and running over on to page 268 there are several authorities cited along that line, the substance and effect of which is, that witnesses are permitted to state their conclusions of the condition of mind of a person as to his being despondent, joyful, angry and all those things.

Now taking all this into consideration the fact that this was cross-examination of a witness called by the defendant to show excitement and anger  overpowering  the defendant—at least that was the purpose to which they sought to have the witness testify here—the fact that this was cross-examination and the fact that the question itself does not go to the point of showing whether there was enough to overwhelm this man so that he did not have consciousness or conscious malice at the time this shot was fired or a well-formed purpose, and as one's appearance may be given by a witness who observed it, we do not think that we should hold that this was such error as to be prejudicial to the defendant.

On page 251 of the record Paul Zeltner is testifying, and among other things he was inquired of whether he went to Toledo a day or two before this homicide and whether he purchased some revolvers and guns there.   That is objected to, but we think that might be asked of him on cross-examination.

On page 287 Andrew Roach testifies.   He was a deputy sheriff of Wood county and went up to this place after learning of the homicide—reached the Zeltner house about one or two o'clock in the afternoon—the homicide having occurred about twelve o'clock noon. John and Paul were at the house or in front of the house on the south side thereof, and he is inquired of whether either of them invited him to come to the house, stating that they would surrender, and he answered, "No, sir."   There is an objection to that and it is suggested to the court to say to the jury that that can only be considered for the purposes of

contradiction and not as substantive testimony in the case. We think it was competent for that purpose. I don't think that Paul Zeltner testified that he had invited Mr. Roach into the house but he testified he was willing to surrender to the sheriff --that someone 'had told him a deputy sheriff was there but he did not believe what was said. We think it might be shown in general contradiction of the story he told that he was willing to surrender himself to the officers of the law. We think it might have been shown that, although he was informed that a deputy sheriff was there, he did not invite him to come to the house. It contradicts more the effect of the defendant's testimony that he was willing all the time to surrender. Roach is also asked again to state where the first shots came from after he arrived on the ground. It is shown, and the defendant testified that his house was surrounded by people clamoring for them and that some of these people were armed and there was more or less shooting. He testified that he and his brother fired each about fifteen or twenty shots from their rifles. The witness is asked where the first shots came from, and that is entirely competent, we think. It was not substantive evidence of the killing but it was part of the defendant's immediate conduct which can always be given in evidence, but it must be confined to rebuttal as the court said.

On page 290 of the record James Donaldson was called in rebuttal and he is asked to state whether he met John and Paul Zeltner at the house in January of that year preceding March, and if in a conversation that was there had John did not say in Paul's presence, "If any attorney makes us any trouble any more and undertakes to make us pay what we don't owe we will put an end to him," and if Paul Zeltner didn't laugh and say, "Yes, that is what we will do, and John and I will run our own business hereafter." That was objected to, overruled and exception. Paul was asked that question and denied that that language was used or anything like it. We think it must be held to be competent.

These are all the exceptions to the evidence, admitted or refused.

It is claimed there were some errors in the charge of the court. The charge is quite long and I will not read it, but parts seriously complained of are found first on pages 326 and 327. It is claimed that the court erred in its definition of the crime of manslaughter. The court said that the statute defines murder in three degrees and states what they are, defining them: "If the killing was unlawful only, with or without a purpose or intent to kill, not malicious and without deliberate and premeditated malice, the degree of crime is manslaughter; if the killing was unlawful and malicious and with a purpose and intent to kill, but without deliberate and premeditated malice, the degree of crime is murder in the second degree; if all of these elements were present, if the killing was unlawful and malicious with deliberate and premeditated malice and with a purpose and intent to kill, then the degree of crime is murder in first degree and in this case if you find the defendant guilty it will be your duty to say that you find him either guilty of manslaughter, or murder in the second degree, or murder in the first degree, according as the elements which constitute their respective degrees of homicidal crime have been established by the evidence beyond a reasonable doubt. As pointed out to you the difference between murder in the second degree and manslaughter is, that in murder in the second degree the killing must have been malicious with a purpose, or intent to kill. Whereas in manslaughter the element of malice growing out of a purpose to kill need not be present. When a person is killed under the influence of great passion or in the heat of blood produced by an adequate or reasonable provocation, and before a reasonable time for the blood to cool and reason to resume its habitual control, and is the result of temporary excitement by which the control of reason was disturbed, rather than by wickedness of heart or cruelty or recklessness of disposition, then the imputation or inference of malice growing out of the killing is repelled and the crime is only manslaughter, but the provocation must have been given at the time of the killing, and must have been of such serious character as would commonly produce a degree of anger, rage, resentment or terror in a person of ordinary

Zeltner v. State.

temper sufficient to render the mind incapable of reflection. Did Mr. Westenhaver at the time and place of the alleged killing by any words or acts on his part give such provocation to his alleged slayers as were calculated to excite violent and irresistible passion in a reasonable person and render him incapable of cool reflection?''

The particular part of this charge that is most criticized is the first clause: ''If the killing was unlawful only, with or without a purpose or intent to kill, not malicious and, without deliberate and premeditated malice, the degree of crime is manslaughter.'' In that the court says that if the killing was unlawful only with a purpose and intent to kill, not malicious, that it would then be manslaughter, and it is contended that that was erroneous, but when you take all that the court has said it must be seen, I think, that the court gave a very full and we cannot discover how in anywise it was an unfair, definition of the crime of manslaughter.

I will not further discuss that because we are of the opinion that the jury having found the elements of murder in the first degree in this case, that the definition of the court given to the crime of manslaughter is immaterial, because the difference as defined in the charge is so great between that and murder in the first degree, that the jury could not have been confused between the two crimes however they may have been between the definition of manslaughter and murder in the second degree. Passing further along, the court stated the statutory definition of murder in the first degree, and then he says:

''To constitute deliberate and premeditated malice within the meaning of the law, the intention to kill must have been deliberated upon, and the design to do it formed before the act which resulted was committed. If a person has actually formed a purpose maliciously to kill, and deliberated and premediated upon it before he performs the act, he is guilty of purposely, and with deliberate and premeditated malice, killing another, however short the time may have been between the formation of the purpose to kill and its execution. It is not the

time of deliberation and premeditation that is requisite, but the actual existence of the purpose, malice, deliberation and premeditation, before or at the time the fatal shot is fired. So that in this case if you believe from the evidence beyond a reasonable doubt that the defendant alone, or while aiding and abetting another unlawfully, purposely, and maliciously shot and killed Elias H. Westenhaver as charged in the indictment, and that before, or at the time, the fatal wound was given the defendant formed in his mind a wilful, deliberate, and premeditated design or purpose to take the life of Mr. Westenhaver and that the wound was inflicted in furtherance of that design or purpose, and without any justifiable cause, then you are authorized to find that the defendant purposely and of deliberate and premeditated malice killed Elias H. Westenhaver.''

To this charge as given there is a general but no specific exception.

Now, taking that clause and reading it as a whole we think that it fairly defines the deliberation and premeditation, which are required to be shown in a case of murder in the first degree. It is urged in criticism of it that the court uses a certain word in two places, in the first place stating it abstractly: ''It is not the time of deliberation and premeditation that is requisite, but the actual existence of the purpose, malice, deliberation and premeditation before or at the time the fatal shot is fired.'' This is a mere abstract proposition, but it is criticized because the court used the expression ''at the time the shot is fired.'' It is evident the court meant the action of firing of the shot, not that he should have premeditated only at the time he pulled the trigger; it meant the action of the firing of the shot.

Then he says, ''In this case if you believe from the evidence beyond a reasonable doubt that the defendant alone or while aiding and abetting another, unlawfully, purposely and maliciously shot and killed Elias H. Westenhaver as charged in the indictment, and that before, or at the time, the fatal wound was given, the defendant formed in his mind a wilful, deliberate and premeditated design or purpose to take the life of Mr. Westenhaver, and that the wound was inflicted in furtherance of that

Zeltner v. State.

design *or* purpose, and without any justifiable cause, then you are authorized to find that the defendant purposely and of deliberate and premeditated malice killed Elias H. Westenhaver.'' Now without reading any further we will say that we think there is no error in this, if the court misspoke, as appears to us from reading this charge by using the conjunction ''or'' in place of ''and'' which would have been a very proper word there, we should be loath to reverse a case of this importance, and after this trial which appears to have been a fair one, upon a single exception urged at the end of a fair charge. If counsel desire to take advantage of a charge because a word in the charge is changed in sense and may have been overlooked by the court, we have before held and still will hold notwithstanding the statute of the state of Ohio that they must point that out to the court at the time. We don't think a fair interpretation of the charge of the court will show anything prejudicial to the defendant; that it takes any unfair advantage or gives a wrong definition or does that which would enable the jury to convict when otherwise he ought not to have been convicted; so we find no error in the admission or rejection of testimony, or in the charge of the court.

Now as to whether the jury were justified in returning this verdict is of course an important question to the defendant, and that is one of the grounds relied on here in this motion for a new trial, and we have read this entire record bearing upon this transaction, and I must say briefly (I am not going over all the evidence in the case) but clearly that the witnesses for the state detailed a very wonderful transaction, almost unheard of in the annals of the civilization of this state. I have never read such a history either in trial or in fiction. The pretense which the defendants were alleging here as exciting them to the commission of this crime was the vaguest pretense in the world. The defendants were allowed to travel all over and give all of the story they could think to give, and I can conceive of nothing that would have excited an ordinary and reasonable man in the transaction that took place in the justice court. That they come from a country that has a civilization as high as ours is

### Wood County.

hard to believe. We find this man carrying a revolver all the days of his life (so he says) showing in the start that he is ready to kill at any moment, and that fact is paraded here as one of the things that they had ordinarily done, and therefore it was in some sense his excuse for taking this man's life. And then again, not content with the old revolvers, they had purchased new ones the day before, and in addition, after purchasing revolvers they bought rifles and ammunition and got ready for something. Got ready for what? There may be considerable in the testimony of the witness, Donaldson, that they said if any lawyer sued them again they would take care of him.

However, the defendant goes on the stand and tells all of the story he wants to tell and in his testimony from beginning to end there is nothing occurs, according to his own story, that ought to have excited him, and according to his own story it did not excite him. I mean that he testified that he saw and heard all the conversation over these papers—that the papers a few minutes before had been turned over to Westenhaver, and that shortly after that and before Westenhaver had evidently had an opportunity to look at them John demanded them back and continued to demand them; says he demanded them six times, and he says it looked as if John was getting more and more excited and he says that excited him a little and he stepped around the end of the table, and he said, "Give him the papers," or "Ain't you going to give him the papers," and then he said his head whirled and from that time on he don't remember anything that took place. Well of course we are not prepared to believe that statement; we simply allow him the benefit of the opportunity that he had to allow his mind to forget what took place afterwards and not tell it upon the stand.

Now according to his story, and he does not vary much from the story of others, nothing was done there that might not have occurred between two of the best friends in the world, nothing but what might have occurred in the trial of any ordinary lawsuit, nothing to excite a reasonable man, nothing to overwhelm his senses, nothing to disturb the free agency of will and thought that every man is presumed to have, and un-

Zeltner v. State.

less you say he was insane before he went there, you cannot say he had any excuse for committing what we might call this butchery.

It stands out prominently, we think, in this story, that these men went to that Justice hall that day with the intention of killing Westenhaver—of getting into a quarrel with him if they could, and to kill him any way. They did not have the quarrel; it did not arise to the dignity of a quarrel; it only arose to a dispute about some papers, and these men deliberately placed themselves one on either side of this man and shot into him three times, and not content with that they followed him firing until he fell in his tracks and then they walked up to him and deliberately shot him in the body while he lay prostrate in the mud.

I don't think it makes any difference which shot was fatal. The conduct of these men shows that they intended to kill this man, and they carried out that intention—they never left him until they had accomplished that purpose. Then they returned to their house and defied arrest until fear got the better of them and they thought they had better surrender to the sheriff rather than let the mob take vengeance on them.

There is nothing in the record that would authorize this court in disturbing the verdict; on the contrary, we think it was entirely just and therefore we affirm it.

**Haynes** and **Parker, JJ.**, concur.